# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. **CR-22-328-PRW** |
| | ) | |
| JARED MICHAEL HARRISON, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AS UNCONSTITUTIONAL

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

STEPHANIE POWERS
Oklahoma Bar No. 22892
Special Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Stephanie.powers2@usdoj.gov

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................iii

FACTUAL BACKGROUND ................................................................................................ 2

DISCUSSION ......................................................................................................................... 3

I.   Mr. Harrison's Vagueness Challenge to Section 922(g)(3) as Applied
     is Premature ................................................................................................................. 3

     A.  Section 922(g)(3) is Not Facially Vague. ....................................................... 4

     B.  Section 922(g)(3) is Not Facially Invalid ....................................................... 6

II.  Section 922(g)(3) Does Not Violate the Second Amendment ................................. 9

     A.  Under *Bruen*, a gun restriction violates the Second Amendment only if
         it burdens conduct covered by the Amendment's text and is inconsistent
         with the nation's historical tradition of firearm regulation............................. 10

     B.  The text of the Second Amendment does not encompass possessing a
         firearm as an unlawful user or addict of a controlled substance...................... 12

         i.   The party challenging a firearm regulation bears the initial burden of
              showing that the Second Amendment's text covers the conduct at issue ... 12

         ii.  The Second Amendment's plain text does not cover possessing a
              firearm as an illegal drug user or addict ......................................................... 13

     C.  Section 922(g)(3) is consistent with the nation's historical tradition of
         firearm regulations ........................................................................................... 16

         i.   Under step two of the *Bruen* test, this Court must determine whether
              Section 922(g)(3) is analogous to "relevantly similar" historical
              firearm regulations ....................................................................................... 17

         ii.  Firearm regulations in America have historically prohibited certain
              presumptively risky persons—including lawbreakers and those with
              dangerously impaired judgment or mental ability—from bearing arms ..... 18

         iii. Section 922(g)(3) is "relevantly similar" to an analogous tradition of
              firearm restrictions in America ....................................................................... 23

i

CONCLUSION ............................................................................................................ 27

CERTIFICATE OF SERVICE ................................................................................... 27

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Federal Cases**

*Beers v. Att'y Gen. United States,*
    927 F.3d 150 (3d Cir. 2019) ....................................................................... 22

*Cook v. United States,*
    140 S. Ct. 41 (2019) ..................................................................................... 7

*D.C. v. Heller,*
    554 U.S. 570 (2008) .............................................................................*passim*

*Dickerson v. New Banner Inst., Inc.,*
    460 U.S. 103 (1983) ................................................................................... 24

*Harmon v. City of Norman, Oklahoma,*
    981 F.3d 1141 (10th Cir. 2020) ................................................................. 13

*Holder v. Humanitarian Law Project,*
    561 U.S. 1, 130 S. Ct. 2705, 177 L.Ed.2d 355 (2010) ................................ 5

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) ..................................................................... 14

*Johnson v. United States,*
    576 U.S. 591 (2015) ..................................................................................... 7

*Libertarian Party of Erie Cnty. v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020) ...................................................................... 14

*Maynard v. Cartwright,*
    486 U.S. 356, 108 S. Ct. 1853, 100 L.Ed.2d 372 (1988)........................ 5, 6

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742 (2010) .............................................................................*passim*

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
    700 F.3d 185 (5th Cir. 2012) ..................................................................... 20

*New York State Rifle and Pistol Association v. Bruen,*
    142 S. Ct. 2111 (2022) ..........................................................................*passim*

*Sabri v. United States*,
    541 U.S. 600 (2004)................................................................................5

*Scarborough v. United States*,
    431 U.S. 563 (1977)..............................................................................25

*United States v. Been*,
    CR-22-268-J, Doc. 30, (W.D. Okla. October 21, 2022)...........................9, 25

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) .........................................................19, 22

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012) .................................................................20

*United States v. Carter*,
    750 F.3d 462 (4th Cir. 2014) ...................................................................9

*United States v. Cheeseman*,
    600 F.3d 270 (3d Cir. 2010) ..................................................................24

*United States v. Cook*,
    914 F.3d 545 (7th Cir. 2019) ...................................................................7

*United States v. Cook*,
    970 F.3d 866 (7th Cir. 2020) ...................................................................5

*United States v. Covington*,
    395 U.S. 57 (1969).................................................................................3

United States v. Daniels,
    No. 22-CR-58-LG-RHWR, 2022 WL 2654232 (S.D. Miss. July 8, 2022)............25, 26

*United States v. Dugan*,
    657 F.3d 998 (9th Cir. 2011) ...............................................................9, 25

*United States v. Easter*,
    981 F.2d 1549 (10th Cir. 1992) ................................................................7

*United States v. Edwards*,
    540 F.3d 1156 (10th Cir. 2008) ..............................................................16

*United States v. Emerson*,
    270 F.3d 203 (5th Cir. 2001) ..................................................................22

*United States v. Focia*,
   869 F.3d 1269 (11th Cir. 2017) ................................................................... 14

*United States v. Johnson*,
   875 F.3d 360 (7th Cir. 2017) ....................................................................... 5

*United States v. May*,
   538 F. App'x 465 (5th Cir. 2013) ............................................................... 9

*United States v. Morales-Lopez*,
   2022 WL 2355920, (D. Utah June 30, 2022) ............................................. 5

*United States v. Patterson*,
   431 F.3d 832 (5th Cir. 2005) ..................................................................... 16

*United States v. Reed*,
   114 F.3d 1067 (10th Cir. 1997) ........................................................*passim*

*United States v. Reese*,
   627 F.3d 792 (10th Cir. 2010) ................................................................... 14

*United States v. Richard*,
   350 F. App'x 252 (10th Cir. 2009) ............................................................. 9

*United States v. Salerno*,
   481 U.S. 739 (1987)..................................................................................... 5

*United States v. Seay*,
   620 F.3d 919 (8th Cir. 2010) ................................................................. 9, 24

*United States v. Seiwert*,
   No. 20-CR-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ............ 25, 26

*United States v. Stupka*,
   418 F. Supp. 3d 402 (N.D. Iowa 2019)....................................................... 7

*United States v. Terrell*,
   172 F.3d 880 (10th Cir. 1999) ..................................................................... 7

*United States v. Turner*,
   842 F.3d 602 (8th Cir. 2016) ....................................................................... 4

*United States v. Waldo*,
   No. 19-03117-01-CR-S-RK, 2020 WL 2617134 (W.D. Mo. Jan. 22, 2020) ................. 7

*United States v. Yancey*,
  621 F.3d 681 (7th Cir. 2010) ..................................................................*passim*

## Federal Statutes

18 U.S.C. § 922(g)(3) ............................................................................... 1

## State Statutes

ARK. CODE ANN. § 5-73-309 ................................................................. 15

Kansas Gen. Stat., Crimes & Punishments § 282 (1868) ................................ 22

TEX. GOV'T CODE ANN. § 411.172(a)(6) .......................................... 15

## Federal Rules

Fed. R. Crim. P. 12(d) ........................................................................... 4

## Federal Regulations

7 C.F.R. § 478.11 ............................................................................. 16, 25

## Legislative Acts

1878 Miss. Laws 175–76 § 2 ................................................................. 23

1883 Mo. Laws 76, § 1 ......................................................................... 23

1883 Wis. Sess. Laws 290 ..................................................................... 23

1890 Okla. Sess. Laws 495, art. 47, § 4 ............................................... 23

1899 S.C. Acts 97, No. 67, § 1 ............................................................. 23

Act XII of March 10, 1655,
  1655 Va. Laws 401 ............................................................................. 22

Gun Control Act of 1968, Pub.L. 90-618, § 102, 82 Stat. 1213 .......................... 4

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ..................................... 17

## Legislative History

S. REP. NO. 90-1501 (1968) ................................................................. 24

## Other Authorities

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662 (1971)................. 19

Carlton F.W. Larson, *Four Exceptions in Search of A Theory*: District of Columbia v.
  Heller *and Judicial Ipse Dixit*,
  60 Hastings L.J. 1371 (2009) ........................................................................................ 22

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second
  Amendment*,
  82 Mich. L.Rev. 203 (1983) ......................................................................................... 21

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons
  from Possessing Firearms,*
  20 Wyo. L. Rev. 249 (2020) ......................................................................................... 19

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo–
  American Right* 123 (1994) .......................................................................................... 19

Patrick J. Charles, "*Arms for Their Defense*"?: *An Historical, Legal, and Textual
  Analysis of the English Right to Have Arms and Whether the Second Amendment
  Should Be Incorporated in McDonald v. City of Chicago,*
  57 Clev. St. L. Rev. 351 (2009) ................................................................................... 19

Richard Moran, *The Origin of Insanity As A Special Verdict: The Trial for Treason of
  James Hadfield*,
  19 Law & Soc'y Rev. 487 (1985) ................................................................................. 21

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges
  Reign?*,
  36 Okla. L.Rev. 65 (1983) ........................................................................................... 21

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the
  Legislative Power of the States of the American Union* 29 (1st ed. 1868)........................ 20

On August 17, 2022, Defendant Jared Michael Harrison was charged in a single-count Indictment (Doc. 1) with possessing a firearm as an unlawful drug user in violation of 18 U.S.C. § 922(g)(3). On October 11, 2022, Mr. Harrison filed a motion to dismiss the Indictment as unconstitutional (Doc. 17). Mr. Harrison first argues that § 922(g)(3) is unconstitutionally vague—both facially and as-applied. Then, relying on the United States Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), Mr. Harrison argues that § 922(g)(3) violates the Second Amendment.

This Court should deny Mr. Harrison's motion to dismiss. As to Mr. Harrison's vagueness challenge, any as-applied challenge is premature at this juncture, and should be denied. Moreover, the Tenth Circuit has previously rejected a facial challenge to § 922(g)(3), nothing that a facial challenge to the statute is improper in the first instance. *See United States v. Reed*, 114 F.3d 1067, 1068–70 (10th Cir. 1997). As to Mr. Harrison's second claim, nothing in *Bruen* casts new doubt on the constitutionality of § 922(g)(3), a statute previously upheld, repeatedly, by federal courts as permissible under the Second Amendment. In *Bruen*, the Supreme Court clarified the two-part test that applies to a Second Amendment challenge to a firearm restriction. The test looks both to the text of the Second Amendment and the history of firearm regulations in America. Section 922(g)(3) satisfies both parts of the *Bruen* test. First, because the plain text of the Second Amendment does not encompass the possession of a firearm by unlawful drug users and addicts, § 922(g)(3) does not even prohibit conduct protected by the Amendment. Second, even if the Second Amendment covered the conduct prohibited by § 922(g)(3), the statute is

nonetheless consistent with a long tradition of disarming lawbreakers—or persons otherwise deemed dangerously irresponsible or unvirtuous—and is therefore constitutional.

## FACTUAL BACKGROUND

On May 20, 2022, a Lawton Police Department officer pulled over Mr. Harrison for a traffic violation. Upon approaching the vehicle, the officer detected a order of both burnt and raw marijuana coming from the vehicle. When asked about the smell and whether he possessed a medical marijuana card, Mr. Harrison—the sole occupant of the vehicle— denied a card and then told the officer that he was heading to work at a dispensary. When the officer asked Mr. Harrison to exit the vehicle and then advised him that his vehicle was going to be searched, Mr. Harrison's behavior changed, and he became visibly nervous. He did, however, admit that the vehicle belonged to him. Upon exiting the vehicle, the officer noted that Mr. Harrison was wearing an ankle monitor. Mr. Harrison advised that he was on probation in Texas for aggravated assault; however, in reality, Mr. Harrison was actually out on bond pending trial.

Once Mr. Harrison was out of the vehicle, a search was conducted, and law enforcement discovered, *inter alia*, a loaded Rossi revolver in the rear driver's side floorboard; one empty prescription bottle that appeared to come from a dispensary inside the driver's side door compartment; one prescription bottle containing pieces of partially smoked marijuana cigarettes inside the driver's side door compartment; and a backpack containing four vape pen cartridges, with two labeled as containing THC, an empty prescription bottle from a dispensary, a mason jar containing 35.4 grams of marijuana, a

"Nerd Drops" prescription bottle from a dispensary containing 55.9 grams of THC edibles, a clear baggie containing what appears to the THC edible gummies weighing 46.2 grams, a metal tray with a lid containing a pre-rolled marijuana cigarette and marijuana stems in the backpack and a blue prescription bottle containing 23.8 grams of marijuana.

Mr. Harrison was subsequently arrested.  He was later charged in this case with a single count of being an illegal drug user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3).  (Doc. 1.)

## DISCUSSION

I.   **Mr. Harrison's Vagueness Challenge to Section 922(g)(3) as Applied is Premature**

Mr. Harrison first argues that his indictment should be dismissed because his § 922(g)(3) is unconstitutionally vague, both facially and as applied. (Doc. 17 at 3-11.) Rule 12(b)(1) of the Federal Rules of Criminal Procedure allows for a challenge to the indictment through pretrial motion that the "court can determine without a trial on the merits." Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington,* 395 U.S. 57, 60 (1969).

The Tenth Circuit has addressed a pretrial motion challenge to § 922(g)(3) on vagueness grounds, holding "that it was error to consider the challenge at the preliminary stage of the proceedings, as was done here." *Reed*, 114 F.3d at 1070. The Court further set

out that "such a sensitive and fact intensive analysis as that undertaken by the district court should be based only on the facts as they emerge at trial." *Id*.

The Eighth Circuit has likewise come to the same conclusion in addressing a vagueness as applied challenge to § 922(g)(3). *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016). "We conclude that a trial on the merits was needed to decide Turner's pretrial motion to dismiss. . . . Indeed, Rule 12 contemplates that district courts may sometimes make factual findings when ruling on pretrial motions and requires that the court state its essential findings on the record. Fed. R. Crim. P. 12(d). Courts may not, however, make factual findings when an issue is inevitably bound up with evidence about the alleged offense itself." *Id*. (citing *United States v. Grimmett*, 150 F.3d 958, 962 (8th Cir. 1998) and *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994) (internal quotations omitted)).

Clearly, any evaluation of Mr. Harrison's vagueness as applied challenge requires a detailed examination of the facts and evidence of the instant case. Any such evaluation at the pretrial stage is premature and should be deferred.

### A.    Section 922(g)(3) is Not Facially Vague.

Section 922(g)(3) has been on the federal books since 1968. *See* Gun Control Act of 1968, Pub.L. 90-618, § 102, 82 Stat. 1213, 1220. Mr. Harrison's motion lacks even a single controlling case that holds this statute is unconstitutional on its face. This is telling as it indicates that the statute, in its 50-plus years of existence, has routinely withstood scrutiny against claims that it is unconstitutional on its face.

Because of this, Mr. Harrison argues general principles of vagueness and asks this Court to follow with the one federal district court that made a post-trial finding of unconstitutionality. *United States v. Morales-Lopez*, 2022 WL 2355920, (D. Utah June 30, 2022). The more prudent path would be to follow Tenth Circuit precedent along with numerous other courts to uphold § 922(g)(3).

Courts have historically analyzed the Fifth Amendment (due process) question of vagueness under an as applied standard.[1] It must be noted that "[f]acial challenges . . . are . . . to be discouraged." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004). Facial challenges "are best when infrequent" and "are especially to be discouraged" when application of the challenged statute to the case at hand would be constitutional when the facts are eventually developed. *Id.* at 608. Not surprisingly, then, "[a] facial challenge to a legislative Act is the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

In the present case, § 922(g)(3), a legislative Act, is not so vague as to be constitutionally deficient under Tenth Circuit precedent, either facially or as applied, because this statute gives ordinary people fair notice of the conduct it punishes.

---

[1] The general practice, outside of the First Amendment context, has been to consider the purported vagueness of a statute in light of the facts of the particular case—i.e., as applied—rather than in the abstract. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988); *United States v. Johnson*, 875 F.3d 360, 370 (7th Cir. 2017). "This means, of course, that a litigant challenging the statute ordinarily must show that it is vague as applied to him; and if the statute undoubtedly applies to his conduct, he will not be heard to argue that the statute is vague as to one or more hypothetical scenarios." *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020); *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19, 130 S. Ct. 2705, 2718–19, 177 L.Ed.2d 355 (2010).

### B.      Section 922(g)(3) is Not Facially Invalid

As noted above, the general practice, outside of the First Amendment context, has been to consider the purported vagueness of a statute in light of the facts of the particular case—i.e., as applied—rather than in the abstract. *See, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). The Tenth Circuit has held that "[a] vagueness challenge" in the context of § 922(g)(3) "cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged" because First Amendment values are not implicated. *Reed* 114 F.3d at 1070. In *Reed*, the defendant was indicted on multiple counts that alleged he was an unlawful user of a controlled substance in possession of a firearm in violation of § 922(g)(3). Prior to trial, the defendant moved to dismiss those charges arguing that the statute was unconstitutionally vague on its face. The trial court dismissed five such counts, ruling that the statute was vague, performing a quasi-as applied analysis based on the government's proffer, because the statute purportedly provided "no guidance as to how nearly contemporaneous the two elements" (unlawful drug user and weapon possession) must be. The Tenth Circuit ruled that the district court erred "in treating defendant's motion to dismiss as an 'as applied' challenge, when the motion clearly raised only an *invalid* facial attack." *Id*. at 1068 (emphasis added).

The reason the facial attack was invalid is because a "vagueness challenge in this context [§ 922(g)(3)] cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged." *Id*. at 1070. Furthermore, the Court held that the "fact intensive analysis" should be based on the facts "as they emerge at trial." *Id*. Additionally, the Tenth Circuit has found that "§ 922(g)(3) is not facially

vague, and a charge of vagueness is to be examined in light of the facts of the case at hand." *United States v. Terrell*, 172 F.3d 880 (10th Cir. 1999) (unpublished) (referencing *Reed*, 114 F.3d at 1070, and *United States v. Easter*, 981 F.2d 1549, 1557 (10th Cir. 1992)).

Since 2017, courts have rejected similar facial challenges. *See, e.g.*, *United States v. Cook*, 914 F.3d 545, 549–55 (7th Cir. 2019) (rejecting facial challenge to § 922(g)(3) and holding that *Johnson v. United States*, 576 U.S. 591 (2015), did not "alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge"), *vacated on other grounds* by *Cook v. United States*, 140 S. Ct. 41 (2019); *United States v. Waldo*, No. 19-03117-01-CR-S-RK, 2020 WL 2617134, at *2–3 (W.D. Mo. Jan. 22, 2020) ("Since *Johnson* was decided, however, the Eighth Circuit has held that a defendant must first show that Section 922(g)(3) is vague as applied to his own conduct before he may raise a facial challenge."); *United States v. Stupka*, 418 F. Supp. 3d 402, 406–13 (N.D. Iowa 2019) (concluding "that there are instances in which a facial void-for-vagueness challenge is permissible without regard to an as-applied challenge," but holding that defendant's challenge to § 922(g)(3) was "not one of those instances" because it was "an attack on language, rather than an attack on process").

Moreover, the plain language of the statute supports a finding that the statute is facially valid. As was outlined above, the core of conduct meant to be prohibited by § 922(g)(3) is "[i]f one regularly uses . . . [a] controlled substance other than as directed by a physician, he may not possess a firearm so long as the use persists." *Cook*, 914 F.3d at 554.

Mr. Harrison complains that the statute fails to define what constitutes an "unlawful user." (Doc. 17 at 7.) The fact that a plain term like "unlawful user of a controlled substance" is not defined does not make that term overly broad. Also, failing to define a term like this within a statute does not make it unconstitutional since many statutes rely on the plain meaning of the words employed by the legislature. Here, the plain meaning of the word "unlawful" means illegal or illicit. This means that the drug use must be illegal in nature. So, not any person who uses a controlled substance qualifies for this first part of the status; only those whose use is unlawful.

Secondly, a person must be a "user." User means the person must actually ingest an illicit controlled substance. The term is present sense, which means they must be, at the time, an unlawful user. User also fairly connotes regular and ongoing use, which is what courts have often relied on in drafting jury instructions. This is because, it is not unlawful "use," meaning past use or only one-time use; single or irregular use is insufficient under the plain language of the statute reigning in his claims of over broadness. User is also a colloquial term that the public understands in the context of a drug user, based on ordinary human experience. This does not mean that the person is high all the time, or using every second of the day, but that the person is a regular drug user.

The statute prohibits an unlawful user of a controlled substance from possessing a firearm. It is that plain and simple, and its meaning requires no speculation. It means that if someone is an unlawful user (present tense, regular, ongoing use, that is more than one single or past use of a controlled substance that is illicit for them) they cannot possess a

firearm. Each of these three things (unlawful, user, and possession of a firearm) are all facts for a jury to determine based upon their plain and ordinary meanings.

Finally, another court in this district recently rejected a substantively identical argument—both a facial and as-applied challenge—in *United States v. Been*, CR-22-268-J, Doc. 30, (W.D. Okla. October 21, 2022).  This Court should follow Judge Jones's lead and do the same here.

## II.    Section 922(g)(3) Does Not Violate the Second Amendment

Section 922(g)(3) prohibits any person who is "an unlawful user of or addicted to any controlled substance" from possessing a firearm. Mr. Harrison argues that § 922(g)(3) violates the Second Amendment under the two-step test announced in *Bruen*. *See* Def.'s Mot. to Dismiss at 1–2 (Doc. 17).[2] Under *Bruen*, this Court must first ask whether "the Second Amendment's plain text" covers the "individual[] conduct" at issue in § 922(g)(3). 142 S. Ct. at 2126. If it does, this Court must then determine if § 922(g)(3) is "consistent with the Nation's historical tradition of firearm regulation." *Id*. If it is, then § 922(g)(3) does not violate the Second Amendment.

---

[2]    Prior to *Bruen*, yet after *D.C. v. Heller*, 554 U.S. 570 (2008), every circuit court to consider the question (including a panel of the Tenth Circuit) held that Section 922(g)(3) does not violate the Second Amendment. *See United States v. Carter*, 750 F.3d 462, 466–68 (4th Cir. 2014); *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 683–87 (7th Cir. 2010); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. May*, 538 F. App'x 465, 466 (5th Cir. 2013) (unpublished); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished). These decisions remain persuasive, especially in how—anticipating *Bruen*—they analogize Section 922(g)(3) to firearm restrictions against felons and the mentally ill.

This Court could deny Mr. Harrison's motion to dismiss under either step of the *Bruen* test. The Second Amendment's text does not encompass possessing a firearm as an unlawful drug user or addict; as the Supreme Court and federal circuit courts have repeatedly explained, the Second Amendment instead guarantees "'the right of *law-abiding*, *responsible* citizens to use arms' for self-defense." *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635). Moreover, in any event, § 922(g)(3) is consistent with a longstanding historical tradition in America of disarming presumptively risky persons, namely, felons, the mentally ill, and the intoxicated.

> **A.**    **Under *Bruen*, a gun restriction violates the Second Amendment only if it burdens conduct covered by the Amendment's text and is inconsistent with the nation's historical tradition of firearm regulation**

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In *D.C. v. Heller*, the Supreme Court recognized that the Second Amendment guarantees an individual right of "law-abiding, responsible citizens" to keep a handgun in the home for self-defense. 554 U.S. 570, 635 (2008); *see McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (applying the same Second Amendment right against the states). However, the Court emphasized in *Heller* that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. In fact, the Court insisted that its decision in *Heller* did not call into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and governmental buildings, or laws imposing conditions and qualifications on the

commercial sale of arms." *Id.* at 626–27. A plurality of the Court later "repeat[ed] those assurances" in *McDonald*. 561 U.S. at 786; *see also id.* ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" (quoting *Heller*, 554 U.S. at 626)).

In *Bruen*, the Supreme Court "made . . . more explicit" the applicable test in a Second Amendment challenge to a firearm regulation. 142 S. Ct. at 2134. As the Court explained, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Applying this test, the Court in *Bruen* held unconstitutional a New York state law that required residents to show "proper cause" to obtain a license to carry a firearm outside their homes. *Id.* at 2123. The Court first concluded that the Second Amendment's plain text covered the conduct at issue because petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134. Moving to step two of the test, the Court embarked on a "long journey through the Anglo-American history" of the public carrying of firearms. *Id.* at 2156. The Court concluded that New York failed to meet its "burden to identify an American tradition justifying the State's proper-cause requirement." *Id.*

**B.**   **The text of the Second Amendment does not encompass possessing a firearm as an unlawful user or addict of a controlled substance**

Under the first step of the *Bruen* test, this Court must determine whether the Second Amendment's text covers (and thus presumptively protects) the prohibited conduct at issue. Here, it does not. The Second Amendment's text does not encompass keeping and bearing arms as an unlawful drug user or addict. Mr. Harrison fails to show otherwise—as it is likely his burden to do under *Bruen*.

**i.**   **The party challenging a firearm regulation bears the initial burden of showing that the Second Amendment's text covers the conduct at issue**

The parties in *Bruen* did not dispute that the conduct at issue—law-abiding citizens publicly carrying handguns for protection—fell within the ambit of the plain text of the Second Amendment. Understandably, then, the Supreme Court did not explicitly address which party bears the burden at the first step of the *Bruen* test. However, in elaborating on the second step of the *Bruen* test, the Court nonetheless strongly implied that this initial burden at step one rests with the challenger of a firearm restriction.

In *Bruen*, the Court stated that, at step two, the government must establish that a challenged law is consistent with the nation's historical tradition of firearm regulation. In this regard, the Court noted that the *Bruen* standard "accords with how we protect other constitutional rights," especially "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id*. at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). This Court should take seriously how the

Supreme Court—first in *Heller*, later in *Bruen*—likened constitutional challenges arising under the Second Amendment with those arising under the First Amendment.

If the two types of constitutional challenges are as analogous as the Supreme Court has suggested, then the party challenging a firearm regulation bears the initial burden of showing that the Second Amendment's text actually covers the conduct at issue. After all, a party challenging a purported restriction on the freedom of speech must show that the Free Speech Clause even applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984))); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies.").

Similarly, here, Mr. Harrison should bear the burden of showing that the Second Amendment even encompasses the right to possess a firearm as an unlawful drug user. Yet Mr. Harrison fails to satisfy this burden, or even really attempt to do so. *See* Def.'s Mot. to Dismiss at 12–13 (Doc. 17).

### ii. The Second Amendment's plain text does not cover possessing a firearm as an illegal drug user or addict

The Supreme Court repeatedly stated in *Heller* and *Bruen* that the Second Amendment right to bear arms belongs to law-abiding, responsible citizens. *See, e.g.*, *Heller*, 554 U.S. at 635 (concluding that the Second Amendment "surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth

and home") (emphasis added); *Bruen*, 142 S. Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding citizen* to possess a handgun in the home for self-defense." (emphasis added)); *id.* ("[O]rdinary, *law-abiding citizens* have a similar right to carry handguns publicly for their self-defense." (emphasis added)); *id.* at 2131 (noting that the Second Amendment "'surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms' for self-defense" (emphasis added) (quoting *Heller*, 554 U.S. at 635)); *id.* at 2156 (concluding that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms" (emphasis added)).[3] Since *Heller* was decided, circuit courts across the country have reiterated this essential point. *See, e.g.*, *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010) (noting that the "core purpose of the right [guaranteed by the Second Amendment] was to allow 'law-abiding, responsible citizens to use arms'" (quoting *Heller*, 554 U.S. at 635)); *Hollis v. Lynch*, 827 F.3d 436, 445 (5th Cir. 2016) ("[The Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." (quoting *Heller*, 554 U.S. at 625)); *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017) ("At its core . . . the Second Amendment protects the right of law-abiding, responsible citizens."); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) ("[W]e have interpreted the core Second Amendment right

---

[3] The majority opinion in *Bruen* makes more than ten references to "law-abiding" citizens in describing the boundary of the right to bear arms guaranteed by the Second Amendment.

identified in *Heller* to be the 'right of law-abiding, responsible citizens.'" (quoting *United States v. Jimenez*, 895 F.3d 228, 234 (2d Cir. 2018))).

Notably, in *Bruen*, the Supreme Court expressly endorsed so-called "shall-issue" firearm-licensing regulations that "require applicants to undergo a background check or pass a firearms safety course . . . to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see id*. at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible."). As Justice Kavanaugh explained in his concurrence (joined by the Chief Justice), the shall-issue regimes "are constitutionally permissible" even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id*. at 2162 (Kavanaugh, J., concurring); *see id*. ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes . . . may continue to do so."). In deeming constitutional these "shall-issue" licensing regimes, the Court merely reiterated that the Second Amendment's text does not extend to arms bearing by irresponsible lawbreakers, including unlawful drug users or addicts.[4]

A person who violates § 922(g)(3) is not a law-abiding, responsible citizen, and his conduct—bearing arms while unlawfully using drugs—simply is not covered by the

---

[4]     Many of these same state "shall-issue" licensing regimes explicitly restrict the rights of unlawful drug users and addicts to carrying firearms. *See, e.g.*, ARK. CODE ANN. § 5-73-309; TEX. GOV'T CODE ANN. § 411.172(a)(6).

Second Amendment's text. Section 922(g)(3) applies to anyone "who is an unlawful user of or addicted to any controlled substance," as defined under the federal Controlled Substances Act. The law requires "a temporal nexus between the drug use and firearm possession." *United States v. Edwards*, 540 F.3d 1156, 1162 (10th Cir. 2008); *see also* 7 C.F.R. § 478.11 (defining "unlawful user" in § 922(g)(3) as a "current user" whose "unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct"); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005) (collecting cases defining unlawful drug user under § 922(g)(3) and explaining that the law requires "contemporaneousness and regularity" in unlawful drug use). A current and regular unlawful drug user or addict is not a law-abiding, responsible citizen, and the Second Amendment's text does not encompass his right to bear arms.

In sum, then, *Heller* and *Bruen* make clear that the Second Amendment guarantees the right of law-abiding, responsible citizens to keep and bear arms. Section 922(g)(3) prohibits a certain type of lawbreaking, presumptively risky citizens—unlawful drug users or addicts—from possessing a firearm. For that reason, then, § 922(g)(3) does not prohibit conduct encompassed by the Second Amendment. This Court may therefore uphold § 922(g)(3) and deny Mr. Harrison's motion to dismiss on the first step of the *Bruen* test.

### C.    Section 922(g)(3) is consistent with the nation's historical tradition of firearm regulations

Mr. Harrison's motion to dismiss fares no better under the second step of the *Bruen* test. Although § 922(g)(3) was first enacted in 1968, it is consistent with a long tradition

of prohibiting certain presumptively risky persons—including lawbreakers and those with dangerously impaired judgment or mental ability—from bearing arms.

      **i.**    **Under step two of the *Bruen* test, this Court must determine whether Section 922(g)(3) is analogous to "relevantly similar" historical firearm regulations**

In *Bruen*, the Supreme Court acknowledged that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." 142 S. Ct. at 2132. As a result, certain modern firearm regulations "were unimaginable at the founding," primarily because they address specific contemporary problems not rampant in earlier eras. *Id*. When confronting such "present-day firearm regulations," the appropriate inquiry at step two of the *Bruen* test is "reasoning by analogy." *Id*. That is, a court must determine "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," which requires determining "whether the two regulations are 'relevantly similar.'" *Id*. (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

Yet, as the Supreme Court noted, this inquiry demands "some metric enabling the analogizer to assess which similarities are important and which are not." *Id*. (quoting Frederick Schauer & Barbara Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017)). Fortunately, the Supreme Court identified two metrics in *Bruen*: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133 (emphasis added). Therefore, "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified* are 'central considerations when engaging in an analogical

inquiry.'" *Id.* (quoting *McDonald*, 561 U.S. at 767). As a result, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Under *Bruen*, then, the relevant question is not whether § 922(g)(3)—or other laws banning unlawful drug users from bearing arms—existed since the nation's founding. Instead, the appropriate analogical inquiry must focus instead on whether § 922(g)(3) is "relevantly similar" to historical firearm regulations in the *burden* it imposes and in its *justification*. Importantly, the government must merely "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133.

> ii.     **Firearm regulations in America have historically prohibited certain presumptively risky persons—including lawbreakers and those with dangerously impaired judgment or mental ability— from bearing arms**

For centuries, Anglo-American law has categorically limited the gun rights of certain presumptively dangerous persons to promote public safety. In seventeenth-century England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights—which *Heller* identified as a "predecessor of our Second Amendment," 554 U.S. at 593—provided that English subjects "may have Arms for their Defence *suitable to their Conditions*, and as allowed by Law." *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added). Simply put, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected

persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo–American Right* 123 (1994); Patrick J. Charles, "*Arms for Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Clev. St. L. Rev. 351, 376, 382–83 (2009).

The English colonies in North America—and later the states of the newly-independent America—carried forward this tradition. One illustrative example (which *Heller* characterized as a "Second Amendment precursor," 554 U.S. at 604), is "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787," signed by Pennsylvania delegates to the Constitutional Conventional who voted against ratification of the Constitution, due to the absence of a Bill of Rights. The "Address" declared that "the people have a right to bear arms for the defense of themselves . . . and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971) (emphasis added). Once ratified, the Second Amendment incorporated "a common-law tradition that permit[ted] restrictions directed at citizens who [were] not law abiding and responsible" and "'[did] not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs. 146 (Winter 1986)).

By the second half of the nineteenth century, American jurist Thomas M. Cooley could proclaim (in a treatise *Heller* described as "massively popular," 554 U.S. at 616) that certain persons—namely, "the idiot, the lunatic, and the felon, on obvious grounds"—had long been "almost universally excluded" from exercising certain civic rights in America, including the right to bear arms. Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868). Not surprisingly, then, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)); *see Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012) (noting that "at the time of the founding, 'the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry),' and that '[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue.'" (quoting Don Kates & Clayton Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359–60)).

This broad tradition—limiting gun rights to responsible, law-abiding, mentally-competent citizens—produced many specific firearm restrictions that targeted certain presumptively dangerous persons. Three notable examples are restrictions against felons, the mentally ill, and the intoxicated.

One of the nation's most deeply rooted firearm restrictions is the "longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626; *see* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L.Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century . . . excluded . . . felons [from possessing firearms]."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L.Rev. 203, 266 (1983) ("Founders [did not] consider felons within the common law right to arms."). Firearm regulations targeting felons exemplify the link that Americans have historically drawn between the right to bear arms and the concept of virtuous, law-abiding citizenry. Americans have long justified laws prohibiting felons from possessing firearms by invoking the idea that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use," and thus, if armed, would pose a unique danger to the public. *Yancey*, 621 F.3d at 685.

Americans also have traditionally viewed the mentally ill as persons who cannot bear arms without posing real danger to public safety. *See Heller*, 554 U.S. at 626 (noting the "longstanding prohibitions on the possession of firearms by . . . the mentally ill"); *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by . . . the mentally ill.'" (quoting *Heller*, 554 U.S. at 626)). As a general matter, in England, justices of the peace could lock up "dangerous lunatics" and seize their property. *See* Richard Moran, *The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield*, 19 Law & Soc'y Rev. 487 (1985) (citing Vagrancy Act of 1744, 17 Geo.

2, c. 5.). Similarly, "in eighteenth-century America, justices of the peace were authorized to lock up 'lunatics' who were 'dangerous.'" Carlton F.W. Larson, *Four Exceptions in Search of A Theory*: District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009). As the Third Circuit has aptly concluded, in reflecting on this historical tradition, "if taking away a lunatic's liberty was permissible, then we should find the 'lesser intrusion' of taking his or her firearms was also permissible." *Beers v. Att'y Gen. United States*, 927 F.3d 150, 158 (3d Cir. 2019); *see United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (noting how "lunatics" and "those of unsound mind" were historically prohibited from possessing a firearm); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) (concluding that historically "the right to arms does not preclude laws disarming . . . the mentally unbalanced").

Finally, state laws have also historically prohibited carrying a firearm while under the influence of alcohol. In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02. In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)). After the ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald*, 561 U.S. at 742, many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on his person a

pistol … or other dangerous weapon"); 1878 Miss. Laws 175–76 § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (forbidding officers from "carrying … arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road).

Importantly, the *justification* for all three prohibitions has historically been the same: felons, the mentally ill, and the intoxicated are presumptively risky persons who pose a danger to public safety if armed.

### iii.  Section 922(g)(3) is "relevantly similar" to an analogous tradition of firearm restrictions in America

The historical tradition of gun regulations prohibiting felons, the mentally ill, and the intoxicated from possessing firearms is "relevantly similar" to § 922(g)(3). *Bruen*, 142 S. Ct. at 2132. All the restrictions impose a comparable *burden*: they categorically prohibit certain persons from possessing firearms. And they all proceed under a comparable *justification*: they protect public safety by keeping guns out of the hands of presumptively dangerous persons, namely, lawbreakers and persons with impaired judgment or mental ability.

Congress enacted § 922(g)(3) for precisely this purpose, and it justified the law in these terms. *See, e.g.*, S. REP. NO. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others *whose possession of firearms is similarly contrary to the public interest*) is a matter of serious national concern.") (emphasis added). As the Supreme Court has concluded, "Congress' intent in enacting § 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 (1983). Lower federal courts have likewise often reached the same conclusion. *See, e.g.*, *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to keep firearms out of the possession of drug abusers, a dangerous class of individuals."); *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010) (noting "Congress' intent to keep firearms out of the possession of drug abusers, a dangerous class of individuals").

In light of Congress's justification for § 922(g)(3), it is easy to see why "[k]eeping guns away from habitual drug abusers is analogous to disarming felons." *Yancey*, 621 F.3d at 684. As previously discussed, ample historical scholarship has established that the Second Amendment right to bear arms was closely tied to the concept of a virtuous citizenry and to the notion that the government could disarm lawbreaking or otherwise unvirtuous citizens who posed a risk to public safety. And so, in prohibiting felons from bearing arms, "Congress sought . . . to keep guns out of the hands of those who have

24

demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough v. United States*, 431 U.S. 563, 572 (1977). This justification undergirds both longstanding firearm restrictions against felons and § 922(g)(3). The notion that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use . . . applies with equal force to Congress's extension of the firearms ban to another category of habitual criminals with § 922(g)(3)." *Yancey*, 621 F.3d at 685.

Section 922(g)(3) is likewise analogous in its justification to laws disarming the mentally ill or intoxicated. As one circuit court has aptly explained, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.*; *see United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (noting, in upholding § 922(g)(3), that "habitual drug users, like . . . the mentally ill, more likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances"). In this regard, it is notable that federal regulations define "unlawful user" in § 922(g)(3) as, in part, one who has "lost the power of self-control with reference to the use of controlled substance." 7 C.F.R. § 478.11.

Since *Bruen* was decided, every district court that has ruled on a Second Amendment challenge to § 922(g)(3) has upheld the law. *See Been*, No. 22-CR-268-J, Doc. 30 (W.D. Okla. Oct. 21, 2022); *United States v. Seiwert*, No. 20-CR-443, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022); *United States v. Daniels*, No. 22-CR-58-LG-RHWR, 2022 WL 2654232, at *4 (S.D. Miss. July 8, 2022). More to the point, most courts have explicitly upheld § 922(g)(3) as relevantly similar to historic firearm restrictions

against felons and the mentally ill. *See, e.g.*, *United States v. Seiwert*, No. 20 CR 443, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022) ("[Section] 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness."); *United States v. Daniels*, No. 22-CR-58-LG-RHWR-1, 2022 WL 2654232, at *4 (S.D. Miss. July 8, 2022) (comparing § 922(g)(3) to "analogous statutes which purport to disarm persons considered a risk to society—whether felons or alcoholics—were known to the American legal tradition," and concluding that "922(g)(3) passes constitutional muster under the legal framework articulated in *Heller* and *Bruen*").

## CONCLUSION

Section 922(g)(3) is unambiguous and satisfies the test announced in *Bruen* and therefore does not violate the Second Amendment. The conduct prohibited by § 922(g)(3)—possessing a firearm as an unlawful drug user or addict—does not burden conduct protected by the Second Amendment's plain text. And, in any event, the prohibition is consistent with an analogous tradition of firearm restrictions in America. The United States therefore respectfully requests that this Court deny Mr. Harrison's motion to dismiss the Indictment as unconstitutional.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney


*s/ Stephanie Powers*
STEPHANIE POWERS
Oklahoma Bar No. 22892
Special Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
Stephanie.powers2@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: J.P. Hill, counsel for Defendant Jared Michael Harrison.

*s/ Stephanie Powers*
STEPHANIE POWERS
Special Assistant United States Attorney