# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | Case No. CR-22-328-PRW |
| v. ) | |
| ) | |
| JARED MICHAEL HARRISON , ) | |
| ) | |
| *Defendant.* ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO HIS MOTION TO DISMISS THE INDICTMENT BASED ON THE UNCONSTITUTIONALITY OF 18 U.S.C. § 922(g)(3)**

Respectfully submitted,

/s/ *Laura K. Deskin*
Laura K. Deskin
Research and Writing Specialist

/s/ *J. P. Hill*
J.P. Hill
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Phone: (405) 609-5930
Fax: (405) 609-5932
Laura_Deskin@fd.org
JP_Hill@fd.org

1

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................................ii

**ARGUMENT IN REPLY** ...................................................................................................... 1

   I.   Vagueness Challenge to § 922(g)(3) ........................................................................ 1

   II.  *Bruen* Challenge ...................................................................................................... 3

      a.   The Plain Text of the Second Amendment Covers the Conduct Prohibited by § 922(g)(3). ................................................................................................................ 3

      b.   The government has not proven that § 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation. ................................................................. 10

**CONCLUSION** ..................................................................................................................... 16

**CERTIFICATE OF SERVICE** ............................................................................................ 17

# TABLE OF AUTHORITIES

**Cases**

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) ...................................................... 15
*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................ passim
*Folajtar v. Att'y. Gen. of the U.S.*, 980 F.3d 897 (3d Cir. 2020) ................................ 15, 16
*Johnson v. United States*, 576 U.S. 591 (2015) ................................................................. 1
*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .................................................................. 16
*Kolender v. Lawson*, 461 U.S. 352 (1983) ........................................................................ 2
*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ............................................. 4, 16
*Robinson v. California*, 370 U.S. 660, 667 (1962) .......................................................... 14
*Sessions v. Dimaya*, 138 S. Ct 1204 (2018) ...................................................................... 1
*United States v. Morales-Lopez*, 2022 WL 2355920 (D. Utah June 30, 2022) ............. 1, 2
*United States v. Quiroz*, __F. Supp. 3d ___, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) ................................................................................................................... 12, 16
*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ................................................ 9, 11
*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ................................................ 4

**Federal Statutes**

18 U.S.C. § 922(g)(3) ......................................................................................................... 3

**Other Authorities**

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) ............................. 13
Joyce Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994) .............................................................................................................................. 5
Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 161–64 (2007) ........................................................................................................ 12
Stephen Halbrook, *The Founders' Second Amendment* 251 (2d ed. 2019) ............... passim
THE FEDERALIST No. 46, at 299 (James Madison) (Clinton Rossiter ed., 1961) .............. 11

**Constitutional Provisions**

U.S. Const., amend. II ........................................................................................................ 3

## ARGUMENT IN REPLY

I.  **Vagueness Challenge to § 922(g)(3)**

Just as in *Morales-Lopez*, the case in which Judge Parrish of the Utah District Court found 18 U.S.C. § 922(g)(3) to be unconstitutionally vague, the government here contends that a defendant may not bring a facial challenge to § 922(g)(3) arguing he is limited to an as-applied challenge. *See United States v. Morales-Lopez*, 2022 WL 2355920, at *2 (D. Utah June 30, 2022). The defendant therein responded just as we will here: "[F]acial attacks are rare but permissible where a statute is tainted by 'hopeless indeterminacy.'" *Id.*, citing *Johnson v. United States*, 576 U.S. 591, 598 (2015). While *Johnson* did not explicitly discard the rule that a litigant whose conduct is clearly prohibited by a statute cannot successfully bring a facial vagueness challenge, it does call into question the current rule established by the Tenth Circuit, as well as the Second, Fourth, Fifth, Seventh, Eighth, Ninth, and the Federal Circuit Court of Appeals. *Morales-Lopez* notes that the current rule established by the circuit courts raises "a logical quandary," and that "*Johnson*, properly applied resolves the quandary presented by … cases applying the old rule—it allows a defendant to bring a facial challenge without regard to the particular facts of his case." *Morales-Lopez, supra*, at *5; *see also Johnson*, 576 U.S. at 624–25, 636–37 (Alito, J., dissenting) (recognizing that the majority's expansion of the vagueness doctrine had upended the "well-established rule" that vagueness challenges to statutes which do not involve the First Amendment must be examined on an as-applied basis). *See also Sessions v. Dimaya*, 138 S. Ct 1204, 1212 (2018) (considering facial challenge without requiring an as-applied challenge).

1

The government next argues that § 922(g)(3) is not vague because *courts* have identified an ascertainable "core" of conduct that (g)(3) prohibits. The question is not, however, whether courts can fathom workable definitions in a particular case; it is whether ordinary people can understand how to avoid breaking the law. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The problem is, as Judge Parrish in *Morales-Lopez* explained, the statute fails to give notice of the conduct it prohibits by failing to define both "user" and the requisite temporal proximity. *Morales-Lopez, supra*, at *8-*9. Applying various canons of construction, the court explained that "unlawful user" must cover something more than single use but something less than the distinct alternate category "addict." *Id*. at *8, *11. The statute provides no further guidance for defining covered conduct within that "chasm." *Id*. at *8. Resort to dictionary definitions is of no help: "user" connotes neither regular nor irregular use "rendering it impossible for ordinary persons to understand when the statute might apply to their level of drug use." *Id*. And because the term "user" does not connote regular and ongoing use, the ordinary person cannot know at what point he may lawfully possess a firearm after using a controlled substance. *Id* at *9. What period of sobriety renders a person no longer a "user"? There is no answer to that question. *See id*. at *11. The "I know it when I see it" approach espoused by the government is no notice at all. As Judge Parrish observed, "Rather than insisting that the legislature enunciate a clear standard to which an ordinary person can conform her behavior, these courts determine *ex post* that the defendant's behavior violated the statute." *Id*. at *9.

Mr. Harrison urges this Court to follow Judge Parrish's well-reasoned opinion finding "922(g)(3) is unconstitutionally vague both because it fails to give ordinary people

fair notice of what conduct it prohibits and because it invites courts, rather than the legislature, to decide what constitutes a crime." *Morales-Lopez*, *supra*, at *8.

II.   *Bruen* Challenge

   a. **The Plain Text of the Second Amendment Covers the Conduct Prohibited by § 922(g)(3).**

There does not appear to be dispute that § 922(g)(3) is a complete ban on "keep[ing] and bear[ing]" firearms. The statute prohibits the mere possession of firearms, even at the defendant's own home. *See* 18 U.S.C. § 922(g)(3) ("It shall be unlawful for any person … (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm or ammunition."). The dispute in coverage is instead over *who* has a right to keep and bear arms. The Second Amendment answers this simply: the people.

The Second Amendment's plain text provides an individual right that "belongs to all Americans." *Heller*, 554 U.S. at 581. The government instead claims this right belongs only to "law-abiding, responsible citizens" to the exclusion of all others. Gov. Resp. at 10, 13–15 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The government's proposed limitation on the scope of the Second Amendment finds no support in constitutional text. The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed." U.S. Const., amend. II (emphasis added).

There is no textual reading of the Second Amendment that cabins the right to "law-abiding, responsible citizens" alone. If there is any tension between the Supreme Court's

3

shorthand description in *Heller* of what the Second Amendment protects and the actual text of the amendment, the text prevails. *Compare Heller*, 554 U.S. at 635 (The Second Amendment "surely elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of hearth and home") *with Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."). While *Heller* made passing reference to "law abiding, responsible citizens," 554 U.S. at 635, it was not in the context of defining the term "the people." Only Justice Stevens' dissent described it as such. *Id.* at 644. Indeed, to restrict "the people" to only the "law-abiding" is inconsistent with *Heller*'s decision to give the phrase "the people" in the Second Amendment the same meaning it carries in other amendments passed at the same time.

In the Constitution, "the people" is a "term of art" and means "all members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580–81 (emphasis added); *accord United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (The term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). The First, Second, Fourth, Ninth, and Tenth Amendments all refer to "the people." There is no cause, or textual support, to claim that "the people" means something different as used in the Second Amendment. The Second Amendment is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. 2111, 2156 (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010)).

The government's attempt to limit the applicability of the Second Amendment to people it deems "law abiding" or "responsible" has no support in the history books either. If the founding generation had intended to protect a right to bear arms for only *some* of the citizens, or to make that right subject to Congressional judgment about who should, and who should not, be trusted with firearms, they could have saved themselves a lot of trouble. They already had a ready-made template in England's 1689 Declaration of Rights:

> That the Subject *which are Protestants*, may have Arms for their Defence *suitable to their Conditions, and as allowed by Law.*

*Heller*, 554 U.S. at 593 (emphases added) (quoting 1 W. & M., ch. 2, § 7, in Eng. Stat. at Large 441). That provision "has long been understood to be the predecessor to our Second Amendment." *Id*. Even 100 years after its adoption, this provision was so well known to James Madison that he mentioned its shortcomings "[i]n his notes for a speech introducing what became the Bill of Rights." Stephen Halbrook, *The Founders' Second Amendment* 251 (2d ed. 2019) (quoting Notes for a Speech in Congress, June 8, 1979, 12 *The Papers of James Madison* 193 (Charles F. Hobson, et al. eds. 1979)). The "fallacies" of the declaration included the fact that it was only an Act of Parliament (and thus could be overcome when Parliament wanted) and it only protected the rights of *some* of the citizens—protestants. *Id*.

The "American drafters" of the Bill of Rights "adopted some English rights verbatim," but "the language of the two pronouncements on arms differs markedly and importantly." Joyce Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 136 (1994). "The American language is much broader" than its British predecessor,

5

in part because it "claims for the 'the people'–presumably regardless of their religion, state, or condition—a right to keep and carry weapons that the government, or at least the federal government, must not breach, unless one restricts the entire right to members of a well-regulated militia." *Id*. at 137.

The founding generation understood that the English Declaration gave the government too much power to disarm its subjects, under the pretense of combatting lawbreaking. The English government, for example, could seize people's guns to enforce (or on the pretense of enforcing) hunting laws. Halbrook, *supra*, at 311. The American Bill of Rights, by contrast, did not "permit *any* prohibition of arms to the people." *Id*. at 312 (quoting 1 Williams Blackstone, *Commentaries* 315–16 (St. George Tucker ed. 1803)).

There were also proposals in America to protect some, but not all, citizens' rights to own guns. At the Pennsylvania convention to consider ratification of the unamended Constitution, 46 delegates voted to ratify it and 23 delegates voted not to ratify without a separate bill of rights. Halbrook, *supra*, at 194. Those who lost the vote published a "dissent," and that dissent included a demand for a separate bill of rights. *Id.* One of those proposed amendments would have protected the people's right to own and carry firearms, but that right could be lost "for crimes committed" or "danger of public injury":

> 7. That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.

Halbrook, *supra*, at 194 (emphasis added) (internal citation omitted).

In the Massachusetts ratification convention, Samuel Adams proposed a slightly different formulation of the right: "peaceable" citizens could never be disarmed:

> And that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms . . . ."

Halbrook, *supra*, at 205 (emphasis added) (internal citation omitted). Adams's proposal—like the Pennsylvania Dissenters' earlier suggestion—failed to secure majority support even within the single convention in which it was proposed. *Id.* at 205–06.

Several other state conventions *did* vote in favor of individual-rights amendments, including amendments protecting the right to weapons of self-defense. But they all suggested amendments *without* Pennsylvania's and Massachusetts's limiting language:

- New Hampshire: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." Halbrook, *supra*, at 213 (emphasis added);

- Virginia: "That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . ." Halbrook, *supra*, at 230;

- New York: "That the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing arms, is the proper, natural, and safe defence of a free state." Halbrook, *supra*, at 239 & n.26; and

- North Carolina: That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . . Halbrook, *supra*, at 246 & n.74.

7

The most important thing to know about the "limiting language" proposed in Pennsylvania, Massachusetts, and New Hampshire, is that it "did not find its way into the Second Amendment." *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting).

After these proposals, Congress got to work on the Bill of Rights. No version of the Second Amendment introduced in Congress included the limiting language proposed in Pennsylvania, Massachusetts, or New Hampshire. There was no suggestion that the right should be limited to "peaceable," "law-abiding," or "responsible" citizens. In fact, there is contemporaneous evidence that such a proposal would have been rejected. As *Heller* recognized, 554 U.S. at 589, James Madison's "original draft of the Second Amendment" included a "conscientious-objector clause":

> The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: *but no person religiously scrupulous of bearing arms shall be compelled to render military service in person.*

Halbrook, *supra*, at 252 (emphasis added); *see also Heller*, 554 U.S. at 589 (quoting this same draft). Massachusetts Representative Elbridge Gerry vigorously objected to the freedom-of-conscience provision *because* it might give the Government too much power to decide who could be disarmed:

> This declaration of rights, I take it, is intended to secure the people against the mal-administration of the government; if we could suppose that, in all cases, the rights of the people would be attended to, the occasion for guards of this kind would beremoved. Now, I am apprehensive, sir, that this clause would give an opportunity to the people in power to destroy the

8

> constitution itself. *They can declare who are those religiously scrupulous, and prevent them from bearing arms*.

Halbrook, *supra*, at 266 (emphasis added) (quoting 11 *Documentary History of the First Federal Congress of the United States of America* 1286 (Bickford et al. eds. 1992)). The Senate later deleted the conscientious objector clause, and both houses adopted the final version of the amendment that was ratified by the states. Halbrook, *supra*, at 274, 278.

This history shows that the Founders knew how to adopt a more limited right (if they had wanted), and even had access to language *proposing* more limited guarantees. They could have followed the English Declaration and guaranteed a right to bear arms "as allowed by Law," which would give Congress the same power that the British Parliament had to decide who should and should not be trusted with guns. They could have taken Samuel Adams's suggestion and protected only "peaceable" citizens' right to keep guns. They even could have provided for a revocable right that could be completely lost upon conviction of a crime, presentation of danger, or participation in rebellion, as the Pennsylvania Dissenters or New Hampshire majority suggested. None of those proposals made the final cut. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). The text ultimately adopted and ratified "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

In sum, the "plain text of the Second Amendment" offers protection to all of the "people," not just those deemed "law-abiding" or "responsible" by the Government. Mr. Harrison, being a member of "the people" of this country, presumptively, maintains a right to possess firearms. The question then becomes whether the government can show that §

922(g)(3) is consistent with the nation's historical tradition of firearms regulation. *See Bruen*, 142 S.Ct. at 2135.

### b. The government has not proven that § 922(g)(3) is consistent with the Nation's historical tradition of firearm regulation.

Because the conduct prohibited by § 922(g)(3) is covered by the plain text of the Second Amendment, the government is required to "affirmatively prove" that § 922(g)(3) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. In *Bruen*, Justice Thomas opined that this historical analysis might sometimes be straightforward. For example, "when a challenged regulation addresses a societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id* at 2131 (emphasis added). "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is constitutional." *Id*. When faced with an "unprecedented societal concern[]" and considering "modern regulations that were unimaginable at the founding," courts are to reason by analogy, considering whether the modern regulation is "relevantly similar" to an historical analogue. *Id*. at 2132.

The purpose of the historical inquiry is to determine whether a regulation comports with the understanding of the Second Amendment *at the time it was enshrined in the Constitution*. However desirable or wise a law may be in today's world is not relevant. According to our Supreme Court, what matters is whether the founders addressed the

problem by distinctly similar means. If the "perceived societal problem" was confronted by the founders, but they either did not address it, or addressed it through "materially different means," the statute at issue is unconstitutional. *Id*. at 2131.The government instead clings to the exact type of means-end rationale that was repudiated by *Bruen*.

Section 922(g)(3) is an attempt to address a problem that existed in 1791: firearm violence by those who, by virtue of intoxication, are likely to demonstrate disinhibition or lack of self-control. The government fails to identify a single historical source from the time of the American Colonies or the early Republic disarming citizens, in the home or elsewhere, based on being a mere user of intoxicants. *See Bruen*, 142 S. Ct. at 2135. The lack of a distinctly similar regulation prohibiting mere users of intoxicants from possessing firearms establishes that § 922(g)(3) is inconsistent with the Second Amendment.

Without that, the government relies on an alleged "tradition" permitting total bans on firearm possession by people the government deems "dangerous." Gov. Resp. at 18–19. As an initial matter, it is not at all clear that this is an appropriate level of generalization for *Bruen*'s purposes. One could just as easily say that there is a tradition of disarming people that the governing authorities wanted to disarm. The government cites to 1689 and the English "tradition" of disarming those perceived as "threatening to the crown." Gov. Resp. at 18-19. That "tradition" is the very practice our founders repudiated with the adoption of the Second Amendment. Thus, for example, in *The Federalist* No. 46, James Madison contrasted the "advantage . . . the Americans possess" (under the proposed constitution) with the circumstances in "several kingdoms of Europe . . .[where] the

11

governments are afraid to trust the people with arms." THE FEDERALIST No. 46, at 299 (James Madison) (Clinton Rossiter ed., 1961).

It no surprise that the Government has not identified a single historical law that burdened the right of an American so severely under comparable circumstances. Indeed, from 1607–1815, American legislatures *refused* to regulate the possession or ownership of firearms by "the body politic," including even "dangerous" citizens. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 161–64 (2007). Judge David Counts of the Western District of Texas recently recognized this in his recent order finding 18 U.S.C. § 922(n) unconstitutional. *See United States v. Quiroz*, __F. Supp. 3d ___, 2022 WL 4352482 at *6 (W.D. Tex. Sept. 19, 2022).

Rather than preemptive disarmament, American tradition reflects "robust use of the colonial and early national states' police power to regulate the *use* of guns." Churchill, *supra*, at 164 (emphasis added). The laws the government cites typify that pattern: they punish the *misuse* of weapons "to promote public safety and to protect private property." *Id*. at 155. Contrary to the government's claim, the historical laws differ markedly from § 922(g)(3) on *Bruen*'s "how and why" metrics. *Bruen*, 142 S. Ct. at 2133.18 U.S.C. § 922 is a product of the Gun Control Act of 1968. At the time of the enactment, this law prohibited people under indictment for, or who were convicted of a crime punishable be imprisonment for at least a year from receiving, shipping, or transporting a firearm. 82 Stat. §§ 922(d)(1),(g)(1). This same section also prohibited the *sale or receipt of firearms* to a person who was an "unlawful user of or addicted to marijuana or any depressant or similar

12

drug … or narcotic drug" and those who "ha[d] been adjudicated as a mental defective or ha[d] been committed to any mental institution." 82 Stat. §§ 922(d)(3)–(4). It was not until 1986 that § 922(g)(3) was amended to prohibit the possession of firearms by drug users and addicts. PL 99–308 (S 49), PL 99–308, May 19, 1986, 100 Stat 449.  Blanket disarmament of drug users is a modern invention entirely, not in keeping with our nation's history.

The government states that 922(g)(3) is "analogous in its justification to laws disarming the mentally ill or intoxicated." Gov. Resp. at 25. Citing a law review article but no actual laws, the government states that "in eighteenth-century America, justices of the peace were authorized to lock up 'lunatics' who were 'dangerous.'" Gov. Resp. at 22.  That full quote from the Hastings Law Journal is actually: "in eighteenth-century America, justices of the peace were authorized to "lock up" "lunatics" who were "dangerous to be permitted to go abroad." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009). It seems that, according to the Law Review article cited by the government, that lunatics were not simply disarmed completely at any rate. It was only those deemed too dangerous "to go abroad." But the government would nevertheless have this Court rule that, since lunatics were locked up in eighteenth century America, a state which naturally comes with disarmament, then in 1986 it was permissible for Congress to pass a law imposing a flat ban on drug users possessing firearms, because drug users are like lunatics. But our country does not equate drug addicts with eighteenth century lunatics. Nor does it treat them the same. Drug users are not "analogous to" lunatics for numerous obvious reasons. Of

13

particular import, unlike eighteenth century lunatics, drug users and addicts cannot be "locked up" just for being drug users and addicts. The Supreme Court recognizes this as abhorrent to our Constitution, especially because drug addiction is an illness "which may be contracted innocently or involuntarily." *Robinson v. California*, 370 U.S. 660, 667 (1962). In 1962, it found a statute criminalizing addiction as a violation of the Eighth Amendment, stating that even "one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.* Just as it is cruel and unusual to subject drug users and addicts to imprisonment for their illness, so too it offends Second Amendment, to ban them from possessing a firearm in self-defense, whether in the cover of their own home or not, wherever they may be, whether the possession is actual or constructive.

The government also analogizes to state laws prohibiting <u>carrying</u> firearms <u>while intoxicated</u>. The laws it cites only ban carrying or using firearms while <u>under the influence</u>, some applicable only to public or peace officers. Such statutes do not evince a "comparable" burden to that of § 922(g)(3). *Id*. at 2131–32. The latter denies the right to possess any gun at all, in any setting, for any purpose. It thus represents a total infringement of the core right to possess guns in the home for self-defense. By contrast, the burden imposed by the statutes cited by the government are more modest. It applies only outside the home, and only when someone is carrying or using a firearm while actually intoxicated. The core right to self-defense recognized by *Heller* was left firmly intact. That the societal concern surrounding the idea of intoxicated people bearing arms was addressed "through materially different means" is further evidence the modern regulation is unconstitutional. *Bruen*, 142 S.Ct. at 2131.

14

And even if they imposed comparable burdens, regulations from the latter half of the nineteenth century "come too late" to establish a historical tradition of disarming users of intoxicants. *Id*. at 2137. Justice Barrett's *Bruen* concurrence, like the opinion itself, suggests that 1791 (when the Bill of Rights was ratified) is the correct date for assessing the scope of permissible federal regulation of an individual right. *Id*. at 2137–39 (opinion); 2163 (Barrett, J., concurring). As Justice Barrett cautioned that *Bruen* "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id*. at 2163 (Barrett, J., concurring).

The government is essentially espousing a "virtue" theory of disarmament that "is not supported by history. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 371–73 (3d Cir. 2016) (Hardiman, J., concurring) ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that "virtuousness" was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.") As Judge Bibas from the Third Circuit stated in his dissent in a pre-*Bruen* opinion that upheld the constitutionality of §922(g)(1), "This idea that the Second Amendment belong only to the virtuous "rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses." *Folajtar v. Att'y. Gen. of the U.S.*, 980 F.3d 897, 919 (3d Cir. 2020) (Bibas, J., dissenting).

The government would retort drug users should be stripped of their Second Amendment right because such people are "dangerous." Only if having the *potential* to

15

engage in faulty decision-making (by virtue of being a drug user) makes one categorically dangerous. That concept in and of itself is highly debatable. Regardless, at the time of our founding, the "dangerousness" with which the founders were concerned was not the potential for faulty decision-making. The "dangerousness" of concern at the time of the founding was as to those who refused to swear a loyalty oath (while at times exempting weapons for defense of house and self). *See Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, J., dissenting). The concern was as to those who presented a perceived threat to the government itself. Dangerousness throughout English and early American history was tied to disloyalty—e.g., those sympathetic to the Crown during the Revolution. *Folajitar*, 980 F.3d at 913–915 (Bibas, J., dissenting); *see also Kanter*, 919 F.3d at 455–56 (Barrett, J., dissenting). Section 922(g)(3)'s burden on drug users is not even close to being "comparably justified" and thus not "relevantly similar to those regulations." *See Bruen*, 142 S. Ct. at 2133.

## CONCLUSION

The Second Amendment is not a "second class right." *McDonald*, 561 U.S. at 780. *Bruen* made clear that courts can no longer balance away an infringement on the Second Amendment. Although "judicial deference to legislative interest balance is understandable—and, elsewhere, appropriate—it is not deference that the constitution demands here." *Bruen*, 142 S. Ct. at 2131. As the District Court for the Western District of Texas concluded, "After *Bruen*, the Government must prove that laws regulating conduct covered by the Second Amendment's plain text align with this Nation's historical tradition. The Government does not meet that burden." *Quiroz*, 2022 WL 4352482, at *13.

This Court should find § 922(g)(3) unconstitutional accordingly.

Respectfully submitted,

/s/ *Laura K. Deskin*
Laura K. Deskin
Research and Writing Specialist

/s/ *J. P. Hill*
J.P. Hill
Assistant Federal Public Defender
Office of the Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Phone: (405) 609-5930
Fax: (405) 609-5932
Laura_Deskin@fd.org
JP_Hill@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2022, I electronically transmitted the attached document to the Clerk of the Court using the ECF system for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant(s):

Stephanie Powers, Stephanie.powers2@usdoj.gov

s/ *Laura K. Deskin*
LAURA K. DESKIN